204 F.Supp.2d 1295 (2002)
THE UTAH ALCOHOLISM FOUNDATION d/b/a Brightway Adolescent Hospital; Julie J. Goates; Jesse Powell and Ryan Powell, through their guardian, Marjorie Fallon, Plaintiffs,
v.
BATTELLE PACIFIC NORTHWEST LABORATORIES-NON-BARGAINING UNIT EMPLOYEES' COMPREHENSIVE MEDICAL BENEFITS PLAN; and Roger K. Ballard, in his capacity as Plan Administrator for the Battelle Pacific Northwest Laboratories Non-Bargaining Unit Employees' Comprehensive Medical Benefits Plan, Defendants.[1]
No. 2:98-CV-648 RNB.
United States District Court, D. Utah, Central Division.
June 17, 2002.
*1296 Brian S. King, Marcie E. Schaap, King & Isaacson, P.C., Salt Lake City, UT, for Plaintiffs.
David W. Slaughter, Snow, Christensen & Martineau, Salt Lake City, UT, Ashley Abel, Jackson, Lewis, Schnitzler & Krupman, Greenville, SC, Iwana Rademaekers, *1297 Jackson, Lewis, Schnitzler & Krupman, Dallas, TX, for Defendants.

MEMORANDUM & ORDER
BOYCE, United States Magistrate Judge.
Plaintiffs filed suit under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001-1461, to recover benefits allegedly due them, pursuant to 29 U.S.C. § 1132(a)(1)(B), and for statutory penalties, pursuant to 29 U.S.C. § 1132(c)(1). The parties agreed to have the magistrate judge conduct all proceedings in this case pursuant to 28 U.S.C. § 636(c)(1). (File entries 107 & 108.) The case is presently before the court on the parties' cross-motions for summary judgment.

I. FACTUAL BACKGROUND[2]
Plaintiffs Ryan Powell and Jesse Powell were beneficiaries of the Battelle Pacific Northwest Laboratories-Non-Bargaining Unit Employees' Comprehensive Medical Benefits Plan ("the Plan") through the employment of their stepfather, John Fallon, III, with Battelle Pacific Northwest Laboratories ("Battelle") in the State of Washington. The Plan is an employee welfare benefit plan as defined by ERISA. During the relevant time period, defendant Roger K. Ballard was the Plan Administrator.
Plaintiffs Jesse and Ryan Powell received in-patient treatment at Brightway Adolescent Hospital in St. George, Utah from September 9, 1995 through September 25, 1995 for mental, emotional, behavioral, and substance abuse problems. (See Admin. R. at B00449-B00534.)[3] In January and February 1996, claims for benefits for the boys' treatment were submitted to the Plan through its third-party claims administrator, the Travelers Plan Administrators ("the TPA"). In April 1996, the TPA sent an Explanation of Benefits (EOB) for each boy denying benefits on the ground that the "inpatient stay was not medically necessary." (Ex. 3 to defs.' Mem. Supp. Mot. Summ. J, file entry 64.)
Subsequently, Brightway contracted with Claims Management, Inc. ("CMI"), a Utah corporation, to provide auditing services and to pursue unpaid claims for benefits. On January 15, 1998, John Fallon, III, signed a form authorizing CMI to act on his behalf with regard to the claims and to obtain copies of relevant plan documents. (See Authorization for Claims Management Inc. to Obtain and Release Information Concerning Patient, attached to letter dated January, 19, 1998, ex. A to orig. compl., file entry 1.)
On January 19, 1998, CMI wrote Battelle a letter directed to the attention of the Plan Administrator requesting the Summary Plan Description (SPD) and the Plan Document that were in effect in 1995.[4] (Letter, ex. A to original compl.) On February 10, 1998, having received no response to its earlier request, CMI faxed a copy of the January 19, 1998 letter, along with the authorization from Mr. Fallon, to Judy Holly, the benefits coordinator, at *1298 Battelle. (Fax cover sheet, ex. B to orig. Compl.)[5] On February 17, 1998, CMI received a document entitled "Comprehensive Medical Plan, Summary Plan Description." (See CMI dep. at 29-32, attached as ex. 2 to defs.' Mem. Supp. Mot. Summ. J, file entry 64.) Plaintiffs assert that this document was only a partial copy of the SPD and that they received no copy of the Plan Document.
On April 6, 1998, CMI wrote two letters to the TPA (one for Ryan Powell and one for Jesse Powell). In these letters, CMI argued that inpatient care for the boys was medically necessary and asked that the Plan "complete a full, fair, and thorough review of this matter." (Letters, ex. C & D to orig. compl.) The letters also requested, in the event that the denial was maintained, that the TPA provide specific, detailed reasons for the denial, the clinical criteria that was used in determining medical necessity, copies of physician reviewers' medical opinions and rationale, and the names and credentials of the reviewers who determined the inpatient treatment was not medically necessary. (Letters, ex. C & D to orig. compl.)
On May 19, 1998, the TPA responded to CMI's letter regarding Ryan. After providing a definition of the term "Medically Necessary," the TPA stated as follows:
The medical documentation furnished for the services associated with Ryan Powell's confinement from September 9, 1995 through September 25, 1995 at Brightway Adolescent Hospital was forwarded to our Medical Review Board for a peer review to be conducted by a board certified physician of the same specialty. The decision made by the physician who performed the peer review is that the documentation does not support the medical necessity for either a psychiatric inpatient level of care nor for a location of care, so far removed from either parent's home.
Based on the terms of the Battelle Memorial Institute's Plan Document and the decision of the peer review, no benefits are payable for expenses related to Ryan Powell's confinement in Brightway Adolescent Hospital from September 9, 1995 through September 25, 1995.
(Letter, ex. E to orig. compl.) On June 15, 1998, the TPA sent a similar letter denying the appeal of Jesse Powell. (Letter, ex. F to orig. compl.)
On May 29, 1998, CMI wrote the TPA indicating that it had received the TPA's letter concerning Ryan Powell. CMI again requested copies of the written opinions of physician reviewers and their rationale, the names and credentials of the reviewers, an entire copy of the Plan Document and/or the Summary Plan Description, and a copy of the Administrative Services Agreement. (Letter, ex. G to orig. compl.)
On June 9, 1998, CMI wrote a letter to Battelle directed to the attention of the Plan Administrator requesting copies of the plan documents. CMI acknowledged that it had received fourteen pages, but had not received the complete plan document. (Letter, ex. H to orig. compl.)
On July 9, 1998, after receiving the TPA's June 15, 1998 letter denying Jesse's appeal, CMI wrote the TPA again requesting the medical reviewers' credentials, written opinions and rationale, and the clinical criteria used in denying the claim. (Letter, ex. I to orig. compl.)
On July 22, 1998, the TPA responded to CMI by requesting a copy of its business license, any documents showing its association *1299 with the Utah and Oregon insurance departments, and an explanation of which parties it was representing along with copies of any agreements with such parties including signed authorizations to release information to CMI. (Letter, ex. J to orig. compl.) On August 6, 1998, CMI sent the TPA the requested information. (Letter, ex. K to orig. compl.)
On September 8, 1998, plaintiffs filed the instant lawsuit. On September 29, 1998, the defendants were served with a copy of the complaint. (See return of service, file entry 2.)
On October 15, 1998, Battelle produced complete copies of the Plan Document and the SPD to CMI.
On November 20, 1998, Roger K. Ballard, the Plan Administrator, wrote to Mr. Fallon to inform him that the appeals were denied as untimely filed. (Letter, Admin. R. at B00397.) Mr. Ballard went on to say that, without waiving or prejudicing the Plan's denial of the claims, the Medical Appeals Committee had reviewed the circumstances surrounding the claims to ensure that they had received a full and fair review. Mr. Ballard then summarized the steps taken prior to denying the claims. (Id.)
First, after receiving all the medical information from the provider, the TPA requested a nurse to review the information to ensure that the inpatient admission was medically necessary. After reviewing the information, the nurse "concluded that an inpatient admission was not medically necessary for either patient, based on the medical information submitted by the provider which offered no observation or conclusion of medical necessity for inpatient, as opposed to outpatient, care." (Id.) Mr. Ballard then provided the Plan's definition of "Medically Necessary," and explained that the services associated with the boys' claims did not appear to be medically necessary because they could have been performed on an outpatient basis. (Id. at B00398.)
Mr. Ballard stated that in order to ensure a full and fair review, the TPA then requested Joel Saldinger, M.D., a psychiatrist, to review Ryan's claim. Dr. Saldinger concluded that Ryan's problems were "behavioral in nature and not related to mental nervous disorders." (Id.) Dr. Saldinger also concluded that inpatient treatment was not medically necessary and that appropriate treatment would have been "either intensive outpatient or, at most, a partial hospital program while the patient continued to reside with one of the parents with both parents involved in ongoing family therapy." (Id. at B00399.)
Mr. Ballard explained that although Dr. Saldinger's evaluation was performed for Ryan's claim only, the TPA felt that the boys' admission and treatment were so similar that denial of Jesse's claim was also justified on the same facts. (Id.) Finally, Mr. Ballard concluded that the TPA had properly denied the claims. (Id.)

II. DISCUSSION

A. Standard for Summary Judgment

Both parties seek summary judgment on plaintiffs' claims for recovery of benefits under the Plan and for imposition of a statutory penalty. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)(quoting Fed.R.Civ.P. 56(c)); accord Goodwin v. General Motors Corp., 275 F.3d 1005, 1007 (10th Cir.2002), petition for cert. filed, 70 U.S.L.W. 3643 (U.S. Apr. 2, 2002)(No. 02-1479); North Tex. Prod. *1300 Credit Ass'n v. McCurtain County Nat'l Bank, 222 F.3d 800, 806 (10th Cir.2000); SEC v. Cochran, 214 F.3d 1261, 1264 (10th Cir.2000).

B. Plaintiffs' Claim for Recovery of Benefits Under the Plan

1. Standard of Review

Plaintiffs seek to recover benefits due them pursuant to 29 U.S.C. § 1132(a)(1)(B). As a threshold issue, the court must determine the appropriate standard of review to be applied to plaintiffs' claim for recovery of benefits. In Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), the Supreme Court held that a denial of benefits challenged under 29 U.S.C. § 1132(a)(1)(B) should be reviewed de novo "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Where the plan does grant such discretionary authority, the court should apply an "arbitrary and capricious" standard in reviewing the plan administrator's actions. Pitman v. Blue Cross & Blue Shield of Okla., 217 F.3d 1291, 1295 (10th Cir.2000); Charter Canyon Treatment Ctr. v. Pool Co., 153 F.3d 1132, 1135 (10th Cir.1998); Siemon v. AT & T Corp., 117 F.3d 1173, 1177 (10th Cir.1997); Chambers v. Family Health Plan Corp., 100 F.3d 818, 825 & n. 1 (10th Cir.1996).
In the instant case, the Plan Document contains the following provision:

Standard of Review. Upon challenge by a covered person, Dependent, or other party, interpretations of Plan provisions, applications of the Plan to specific fact patterns, and/or discretionary actions by the Plan Administrator and/or any other Plan fiduciaries shall be sustained unless the interpretation, application, or action in question was arbitrary and capricious.
(Plan doc., ex. B to Ballard Aff., at B00048.) The parties agree that this language is sufficient to confer discretion on the Plan Administrator. (See pls.' Supplemental Mem. Re: Std. of Review at 7, file entry 103.) However, plaintiffs contend that because this language appeared only in the Plan Document and was not included in the Summary Plan Description (SPD), it failed to give adequate notice and is therefore unenforceable.[6] Plaintiffs argue that, as a result, the court should apply a de novo standard of review to the denial of their claims.
Both parties acknowledge that where there is a conflict between the plan document and the SPD, the SPD generally will control. Semtner v. Group Health Serv. of Okla., Inc., 129 F.3d 1390, 1393 (10th Cir.1997); Charter Canyon Treatment Ctr., 153 F.3d at 1136. However, several courts have rejected the argument that silence in the SPD creates a conflict with the plan document.
Although not considering the precise question presented in the instant case, the Tenth Circuit recently held that when the SPD is silent on an issue, there is no conflict with the master plan document. In Charter Canyon Treatment Ctr. v. Pool Co., 153 F.3d 1132, the defendant Pool Company's utilization review contractor initially pre-certified a teen-age boy's hospitalization *1301 at Charter Canyon for treatment of major depression. However, shortly after he was discharged, the boy's file was submitted for a retrospective utilization review based upon perceived inconsistencies in his medical records. Following the review, Pool Company denied coverage for the boy's treatment at Charter Canyon. Id. at 1133-34. Pool Company explained that the boy's claim for benefits was denied because he was not an imminent threat to himself or others; the severity of his condition did not justify acute hospital intervention; and there was no evidence in the record that the treatment provided was of such intensity that it could only have been provided in an acute inpatient setting. Id. at 1134.
The master plan document expressly granted the plan administrator the power to conduct retrospective reviews, but such reviews were not mentioned in the SPD. Id. at 1136. On appeal, plaintiff Charter Canyon argued that certain language in the SPD limited the defendant's discretion to conduct a retrospective review.
In rejecting this argument, the Tenth Circuit stated that in order for an SPD to prevail over a plan document, there first must be an actual conflict. The court stated as follows:
First, it is axiomatic that if a summary's language can trump language contained in the master plan documents in the event of a conflict, the documents must actually conflict. If the plan documents do not conflict, the important policy of protecting beneficiaries from misleading or false information contained in a summary plan description is not implicated. Thus, a summary plan description which is silent on a specific term or issue cannot prevail over the master plan document.
Id. at 1136.
In the instant case, the Plan Document specifically confers discretionary authority on the Plan Administrator while the SPD is silent on this issue. Thus, as in Charter Canyon Treatment Ctr., there is no conflict between the Plan Document and the SPD. Similarly, failure to include the discretionary language in the SPD in this case did not negate such language in the plan document, just as ambiguous language in the SPD in Charter Canyon could not override the language of the plan document.
Further, other courts have considered the exact issue presented in this case and have held that the grant of discretionary authority in the plan document is not obviated by failure to describe the discretionary authority in the SPD. In considering this issue, the Fourth Circuit concluded that where the discretionary authority appears in the plan document, the absence of discretionary language in the SPD does not create a conflict, and the plan document controls. The court stated as follows:
Although the SPD contains no such language, we find no conflict between the absence of discretionary language in the SPD and its presence in the Plan. Vesting the plan administrator with discretion in making coverage decisions simply does not conflict with the SPD's silence on the matter. Therefore, the Plan controls, and it vests the administrator of the plan with discretion in making coverage decisions.
Martin v. Blue Cross & Blue Shield of Va., Inc., 115 F.3d 1201, 1205 (4th Cir.1997)(footnote & citations omitted).
Again, in Cagle v. Bruner, 112 F.3d 1510 (11th Cir.1997), the plaintiffs argued that the SPD, rather than other plan documents, must contain the discretionary language in order for the arbitrary and capricious standard to apply. The court rejected this argument, stating that the court looks to all of the plan documents to *1302 determine whether there is a reservation of discretion to the plan administrators or fiduciaries. Id. at 1517.
Similarly, the Eighth Circuit has rejected the argument that in order to satisfy ERISA's requirement that an SPD be sufficiently comprehensive to apprise participants of their rights under the plan, see 29 U.S.C. § 1022(a)(1), the SPD must contain a description of the administrator's discretion. Wald v. Southwestern Bell Corp. Customcare Med. Plan, 83 F.3d 1002, 1006 (8th Cir.1996). See also Atwood v. Newmont Gold Co., 45 F.3d 1317, 1321 (9th Cir.1995)(rejecting the argument that the court should use a de novo standard of review where the SPD did not state that the plan administrator had discretionary authority to determine eligibility for benefits and to construe the terms of the plan).
In support of their argument that the discretionary language must appear in the SPD, plaintiffs cite Herzberger v. Standard Ins. Co., 205 F.3d 327 (7th Cir.2000). The issue in Herzberger was whether certain language in plan documents was sufficient to confer discretion on the plan administrator. Id. at 329. In that case, Judge Posner discussed the importance of clear language giving notice to an employee that the plan administrator retains broad discretion in determining a claim for benefits. See id. at 331, 332-33. However, Herzberger does not directly support plaintiffs' position since it did not deal with a fact situation such as the one in the instant case where clear language conferring discretion appears in the master plan document, while the SPD is silent on the matter.
Plaintiffs also argue that they are entitled to a remedy, i.e., a less deferential standard of review, for defendants' failure to provide a timely update of the SPD and to issue a new SPD every five years incorporating all changes in violation of 29 U.S.C. § 1024(b)(1). However, since plaintiffs have shown no prejudice as a result of the procedural violations, this argument too must fail. See Sage v. Automation, Inc. Pension Plan & Trust, 845 F.2d 885, 895 (10th Cir.1988); Martin, 115 F.3d at 1205 n. 4.
Plaintiffs also argue that the SPD must contain the discretionary language in order to satisfy section 1022(b) which requires that the SPD must contain certain information including "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits." However, the court concludes that the failure to describe the plan administrator's authority to exercise discretion in adjudicating claims does not fall within this definition. See Wald, 83 F.3d at 1006 (rejecting the argument that § 1022(a)(1) requires the SPD to contain a description of the administrator's discretion); Atwood, 45 F.3d at 1321-22 (stating that the SPD should explain the plan's rules in such a way that an ordinary employee would recognize that "certain events or actions could trigger a loss of benefits," and that the discretionary language provision "has no bearing on the events or actions determinative of eligibility under the plan.") (emphasis in original).
Based upon the above authority, the court concludes that there is no requirement that the discretionary language must appear in the SPD. Since the Plan Document conferred discretion upon the Plan Administrator to determine eligibility for benefits and to construe the terms of the plan, the arbitrary and capricious standard of review applies to plaintiffs' claim for recovery of benefits.

2. Denial of Plaintiffs' Appeals as Untimely

Although ERISA contains no explicit exhaustion requirement, the Tenth Circuit has stated that "exhaustion of administrative (i.e., company- or plan-provided) remedies *1303 is an implicit prerequisite to seeking judicial relief." McGraw v. Prudential Ins. Co. of Am., 137 F.3d 1253, 1263 (10th cir.1998) (quoting Held v. Manufacturers Hanover Leasing Corp., 912 F.2d 1197, 1206 (10th Cir.1990)); accord Whitehead v. Oklahoma Gas & Elec. Co., 187 F.3d 1184, 1190 (10th Cir.1999); Gaylor v. John Hancock Mut. Life Ins. Co., 112 F.3d 460, 467 (10th Cir.1997). However, because ERISA itself does not specifically require exhaustion, "courts have applied this requirement as a matter of judicial discretion." McGraw, 137 F.3d at 1263; Communications Workers of Am. v. AT & T, 40 F.3d 426, 432 (D.C.Cir.1994).
In the instant case, the SPD contained the following statement concerning the right to appeal a denied claim:
If you do not understand or agree with a claim denial, you should discuss the matter with the Claims Administrator. If you are still not satisfied with the explanation, within 60 days after receiving the denial, you, your beneficiary, or a duly authorized representative may then submit a written request for reconsideration of the claim.
(SPD at B00082, attached as ex. A to Ballard aff.) Based on this provision in the SPD, the Plan Administrator denied plaintiffs' appeals as untimely because they were not submitted within sixty days after the denial of their claims. (Letter of 11/20/98 from Ballard to Fallon, Admin. R. at B00397.)
Defendants contend that since almost two years elapsed before plaintiffs filed their appeals, the Plan Administrator's determination that the appeals were untimely was not arbitrary and capricious. Plaintiffs respond that because the notice denying benefits ("explanation of benefits" or "EOB") did not give adequate notice of their right to appeal and the time limit involved, as required by the regulations, the Plan Administrator's decision was arbitrary and capricious.
The EOBs sent to plaintiffs contained the following statement with regard to an appeal: "If your benefit plan is subject to the Employee Retirement Income Security Act of 1974 (ERISA), a review of this benefit statement may be requested by following the steps outlined in your benefit booklet." (Ex. 3 to Defs.' Mem. Supp. Mot. Summ. J., file entry 64.)
The pertinent portion of the regulations in effect during the relevant time period provided as follows:
(b) Obligation to establish a reasonable claims procedure. Every employee benefit plan shall establish and maintain reasonable claims procedures.
(1) A claims procedure will be deemed to be reasonable only if it:
. . . .
(iv) Provides for informing participants in writing, in a timely fashion, of the time limits set forth in paragraphs (e)(3) and (g)(3) and paragraph (h) of this section.
. . . .
(e) Notification to claimant of decision.

(1) If a claim is wholly or partially denied, notice of the decision, meeting the requirements of paragraph (f) of this section, shall be furnished to the claimant within a reasonable period of time after receipt of the claim by the plan.
. . . .
(f) Content of notice. A plan administrator . . . shall provide to every claimant who is denied a claim for benefits written notice setting forth in a manner calculated to be understood by the claimant:
. . . .
(4) Appropriate information as to the steps to be taken if the participant or beneficiary wishes to submit his or her claim for review.

*1304 . . . .
(g) Review procedure.

. . . .
(3) A plan may establish a limited period within which a claimant must file any request for review of a denied claim. Such time limits must be reasonable and related to the nature of the benefit which is the subject of the claim and to other attendant circumstances. In no event may such a period expire less than 60 days after receipt by the claimant of written notification of denial of a claim.
29 C.F.R. § 2560.503-1 (2000).
Defendants argue that the language of the regulation pertaining to notification of the time limit for appeal specifies what the plan document must contain, but does not mention what the EOB must contain. However, the court disagrees with this interpretation and concludes that under a fair reading of the regulation, a plan must provide claimants with written notice of claims procedures and the time limit for an appeal.[7] The EOBs sent to plaintiffs do not satisfy this requirement in that they do not provide appropriate information as to the steps to be taken to obtain a review and they do not specify any time limit. Further, the inadequacy of the notice is not cured by the suggestion that if the benefit plan is subject to ERISA, the claimant may request a review by following the steps in the benefit booklet.[8]See Conley v. Pitney Bowes, 34 F.3d 714, 718 (8th Cir.1994) (refusing to impose a legal rule that possession of the SPD gave the claimant constructive knowledge of the appeals procedure).[9]
This is not a case in which the claimants simply failed to exhaust their administrative remedies. Plaintiffs attempted to obtain a review of their claims, and in fact, did obtain such a review, albeit outside the sixty-day time limit. Accordingly, the court concludes that because the Plan failed to comply with the regulations by adequately informing plaintiffs of their right to appeal, the procedure to be followed, and the time limit involved, the Plan Administrator's decision to deny their appeals as untimely was arbitrary and capricious.[10]

*1305 3. Denial of Claims as Not Medically Necessary

The Plan Administrator concluded that the boys' claims were properly denied because their treatment at Brightway was not medically necessary within the meaning of the plan. Defendants contend that this determination was not arbitrary and capricious and should be upheld.
The Plan Document defines the term "medically necessary" as follows:
The term Medically Necessary means that the service or supply is considered necessary for the diagnosis or treatment of a Sickness or Injury, and is provided at an appropriate level of care. In determining questions of necessity, consideration will be given to the customary practices of Physicians in the community where the service or supply is provided. Those services and supplies which are not considered Medically Necessary include the following:
(1) Those which are of unproven value or of questionable current usefulness;
(2) Those which are unnecessary when performed or rendered in combination with other services or supplies;
(3) Diagnostic services which are unlikely to provide a Physician with additional information when used repeatedly;
(4) Those which are not ordered by a Physician or which are not documented in a timely fashion in the patient's medical records or which can be performed or rendered with equal efficiency at another type of facility (e.g., on an outpatient basis); and
(5) Those which are for the convenience of the patient or the attending Physician.
(Plan Doc., ex. B to Ballard aff., at B00018.)
Under the arbitrary and capricious standard, "a court may not overturn a plan administrator's decision if it was reasonable, given the terms of the plan, and made in good faith." Jones v. Kodak Med. Assistance Plan, 169 F.3d 1287, 1292 (10th Cir.1999); accord Trujillo v. Cyprus Amax Minerals Co. Retirement Plan Comm., 203 F.3d 733, 736 (10th Cir.2000); Averhart v. U.S. WEST Management Pension Plan, 46 F.3d 1480, 1485 (10th Cir.1994). In explaining the deference to be accorded the determination of the Plan Administrator, the Tenth Circuit has stated as follows:
When reviewing under the arbitrary and capricious standard, "[t]he Administrator['s] decision need not be the only logical one nor even the best one. It need only be sufficiently supported by facts within [his] knowledge to counter a claim that it was arbitrary or capricious." The decision will be upheld unless it is "not grounded on any reasonable basis." The reviewing court "need only assure that the administrator's decision fall[s] somewhere on a continuum of reasonableness-even if on the low end."
Kimber v. Thiokol Corp., 196 F.3d 1092, 1098 (10th Cir.1999) (alterations and emphasis in original) (citations omitted).
In the instant case, the administrative record supports the Plan Administrator's determination that the boys' inpatient treatment at Brightway was not medically necessary under the terms of the *1306 plan. The record contains the opinion of Joel Saldinger, M.D., a psychiatrist, who reviewed Ryan Powell's claim and the medical records submitted by CMI. Dr. Saldinger noted that there was no documentation showing that Ryan had had a psychiatric evaluation or consultation prior to his arrival at Brightway. (Psychiatric Consultant's Report, Admin. R. at B00400.) Although there was a history of substance abuse, including alcohol and marijuana, negative drug screens supported Ryan's assertion that he had not used marijuana for a couple of months prior to admission. (Id.) Dr. Saldinger also noted that Ryan's treatment plan at Brightway included family therapy, but there was no indication that family therapy had occurred.[11] (Id.) In addition, Dr. Saldinger stated that there was no documentation in the hospital chart indicating that Ryan was an imminent danger to himself or others, although there was documentation describing parentchild conflict with his father, mother, and stepfather. (Id.) Further, although the records indicated that Ryan had been receiving outpatient therapy prior to his admission at Brightway, there was no description of the intensity or frequency, and no documentation that either intensive outpatient or a partial inpatient program was considered prior to his admission. (Id.)
Dr. Saldinger explained his conclusion that Ryan's treatment at Brightway was not medically necessary as follows:
Neither the history prior to admission nor the behavior while in the hospital support the medical necessity for an inpatient level of care. The treatment provided was not appropriate, since, among other things, there is no documentation describing appropriate on site family therapy. Based on the documentation provided, the medically necessary and appropriate treatment was either intensive outpatient or, at most, a partial hospital program, while the patient continued to reside with one of the parents and both parents would have been included in ongoing family therapy.
(Id. at B00403.)
In addition to the opinion of Dr. Saldinger, other evidence in the record also supports the Plan Administrator's determination. For example, there was no evidence that the boys were a threat to themselves or others. There were only two incidents in the record referring to violent tendencies on the part of the boys. In the first incident, they were involved in an altercation with their stepfather that had resulted in their being charged with assault. However, as Dr. Saldinger noted, this incident occurred at least a year, if not many years, prior to their admission at Brightway. (See Admin. R. at B00403, B00458, B00464, B00511, B00517.) In the other incident, Ryan had had an angry outburst about a year earlier in which he had put his arm through a glass window, severing an artery. (Admin. R. at B00506, B00516.) Further, both boys denied that they had a desire to hurt or harm anyone. (Id. at B00463, B00517.) In addition, the boys' evaluations indicated that they were not suicide risks. (Id. at B00460, B00463, B00513, B00516.)
The boys had a history of substance abuse, specifically alcohol and marijuana. However, Jesse had been drunk on only two or three occasions and reported that he had stopped using marijuana about a month before his admission to Brightway. (B00453, B00463.) Similarly, Ryan reported that he had been drunk on two occasions *1307 in the past six months and had not used any marijuana for two months prior to his admission. (B00507, B00517.) The boys' statements that they had stopped using drugs and alcohol were supported by negative drug tests. (B00486, B00539.)
As discussed, the Plan's definition of "medically necessary" required that treatment must be provided at an "appropriate level of care." (Plan Doc., ex. B to Ballard aff., at B00018.) In addition, services that were not considered medically necessary included those "which can be performed or rendered with equal efficiency at another type of facility (e.g., on an outpatient basis)." (Id.)
After reviewing Dr. Saldinger's opinion and the other evidence in the administrative record, the court concludes that the Plan Administrator's determination that the boys's treatment at Brightway was not medically necessary was supported by substantial evidence and was reasonable under the terms of the plan. Accordingly, the Plan Administrator's determination was not arbitrary and capricious.

C. Statutory Penalty for Failure to Produce Documents

As discussed, plaintiffs, through CMI, submitted written requests to Battelle for the Summary Plan Description and the Plan Document on January 19, 1998, February 10, 1998, and June 9, 1998.[12] Plaintiffs state that they received an incomplete copy of the SPD on February 17, 1998. They did not receive the complete SPD and Plan Document until October 15, 1998, after this litigation was filed.
Plaintiffs seek statutory penalties for defendants' failure to produce the plan documents under ERISA's disclosure and penalty provisions, 29 U.S.C. §§ 1024(b)(4) and 1132(c). The disclosure provision states in pertinent part as follows: "The administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated." 29 U.S.C. §§ 1024(b)(4); see Firestone Tire & Rubber Co., 489 U.S. at 116, 109 S.Ct. 948. Under the penalty provision, if the plan administrator fails to mail the material within thirty days following the request, he may, in the court's discretion, be personally liable for up to $110[13] a day from the date of the failure or refusal to provide the documents. 29 U.S.C. § 1132(c)(1); see Firestone Tire & Rubber Co., 489 U.S. at 116, 109 S.Ct. 948.
The Plan Administrator contends that he was not required to produce the documents to CMI because it is not a "participant or beneficiary" under the statute.[14] However, in an advisory opinion, the Department of Labor has taken the view that where information is required to be furnished to a participant or beneficiary under ERISA, it must be provided to a third party where "the participant has authorized in writing the release of the information to such third party." DOL Advisory Opin., 79-82A, 1979 WL 7019, at *1; accord DOL Advisory Opin. 82-21A, 1982 WL 21205 at *2. The Plan Administrator *1308 argues that under Department of Labor procedures, advisory opinions may only be relied upon by the parties requesting the opinion. (See ERISA Proc. 76-1, sec. 10, attached to Defs.' Reply Mem., file entry 87.) While this may be true, the opinion letters do provide guidance as to how the Department interprets the statute that it implements. See Chevron, U.S.A., Inc. v. Natural Res. Defense Council, Inc., 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (stating that courts should accord considerable weight to an agency's interpretation of the statute it administers). Accordingly the court rejects defendants' argument that it was not required to release the material, and concludes that CMI was the duly authorized representative of Mr. Fallon, a participant in the Plan.
It is clear that CMI submitted written requests for the documents on several occasions, but the Plan Administrator did not provide all of the documents until October 15, 1998, after the defendants were served with process in this case. Thus, the court finds that the Plan Administrator violated section 1024(b)(4) and is thus subject to a penalty under section 1132(c)(1).
Plaintiffs have asked for a penalty at the maximum rate of $110 per day for each boy based on each separate request for documents for a total of $133,870. In other words, the plaintiffs contend that each time, they requested the documents, a new penalty period began to run. In support of this request, plaintiffs note that under the express language of the statute, "each violation . . . with respect to any single participant or beneficiary shall be treated as a separate violation." 29 U.S.C. § 1132(c)(1).
Under section 1132(c), the determination whether to impose statutory penalties is in the discretion of the district court. Moothart v. Bell, 21 F.3d 1499, 1504 (10th Cir. 1994); Boone v. Leavenworth Anesthesia, Inc., 20 F.3d 1108, 1111 (10th Cir.1994); Deboard v. Sunshine Mining & Refining Co., 208 F.3d 1228, 1244 (10th Cir.2000). In deciding whether to award fees, neither prejudice nor injury is a prerequisite. Moothart, 21 F.3d at 1506; Boone, 20 F.3d at 1111; Sage v. Automation, Inc. Pension Plan & Trust, 845 F.2d 885, 894 n. 4 (10th Cir.1988). However, the court may consider these factors in the exercise of its discretion to award a penalty. Moothart, 21 F.3d at 1506; Deboard, 208 F.3d at 1244; Faircloth v. Lundy Packing Co., 91 F.3d 648, 659 (4th Cir.1996).
In the instant case, plaintiffs have suffered no prejudice or injury as a result of defendants' failure to produce the requested documents other than having to resort to litigation to obtain them. The court therefore concludes that to treat each request by plaintiffs as a separate violation and to award penalties accordingly would be excessive. Nevertheless, the court finds that the Plan Administrator failed to comply with the statute and provide the documents in a timely fashion. The court therefore concludes that a penalty of $500 is appropriate.

III. ATTORNEY'S FEES
Plaintiffs have requested an opportunity to present legal argument and evidence in support of an award of attorney's fees pursuant to 29 U.S.C. § 1132(g)(1) which provides in pertinent part as follows: "In any action under this subchapter . . . by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." The court will allow plaintiffs to submit argument and documentation limited to the time expended on the statutory penalty issue only. The information should be submitted by July 8, 2002. Defendants may have fourteen days to respond.

*1309 IV. ORDER
The court concludes that the Plan Administrator's determination concerning the medical necessity of the boys' treatment was not arbitrary and capricious. Accordingly, no genuine issue of material fact exists on this issue and defendants' motion for summary judgment on the plaintiffs' claim for recovery of benefits is granted and plaintiffs' motion is denied.
Similarly, no genuine issue of material fact exists on the issue of the statutory penalty for failure to provide plan documents. Therefore, plaintiffs' motion for summary judgment is granted on this issue and defendants' motion is denied. Plaintiffs are entitled to an award of $500.
IT IS SO ORDERED.
NOTES
[1] Changes in the named parties have been made pursuant to orders of the court, file entries 43, 65, and 83. See Fed.R.Civ.P. 15, 25.
[2] It should be noted that the affidavits of David G. Ericksen, David I. Korsh, Mary Covington, and Marcie E. Schaap, submitted by plaintiffs in support of their motion for summary judgment, were stricken and thus are not before the court. (See order, file entry 96.)
[3] A copy of the administrative record is attached as exhibit C to the affidavit of Roger K. Ballard which is exhibit 1 to defendants' memorandum in support of the their motion for summary judgment, file entry 64.
[4] Plaintiffs assert that the authorization signed by Mr. Fallon was attached to this letter. Defendants dispute whether the authorization was attached since it is not referenced in the letter.
[5] Defendants again dispute whether the authorization from Mr. Fallon was attached to this transmission.
[6] The Plan was amended in November 1990 to include the discretionary language, but the amendment was not incorporated into the SPD until June 1997 when a new SPD was issued. Plaintiffs assert that this was a violation of 29 U.S.C. § 1024(b)(1) which requires the plan administrator to furnish a copy of an updated SPD with "any material modification in the terms of the plan," 29 U.S.C. § 1022(a), within 210 days after the end of the plan year in which the change was adopted. Plaintiffs also allege that defendants violated the provision of section 1024(b)(1) which requires the plan administrator to furnish an updated SPD every five years.
[7] The regulation has since been revised and the current version makes clear that the EOB must contain notification of the time limit for appeal. The pertinent portion of the regulation provides as follows:

The notification shall set forth, in a manner calculated to be understood by the claimant . . . [a] description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under section 502(a) of the Act following an adverse benefit determination on review.
29 C.F.R. § 2560.503-1(g)(1)(iv) (2001).
[8] As plaintiffs point out, few claimants would know whether their benefit plan was subject to ERISA.
[9] Defendants assert that Conley has no application to this case because the Eighth Circuit has adopted a contractual exhaustion requirement, unlike the Tenth Circuit which applies a judicially-crafted exhaustion requirement. However, the main distinction between the two exhaustion doctrines is that the Eighth Circuit does not require exhaustion in ERISA cases unless it is required by the particular plan involved. Conley, 34 F.3d at 716. In fact, the Conley court specifically noted that the terms of the regulations, as well as the terms of the plan at issue in that case, conferred upon the claimant "a right to more than just a copy of the summary plan description." Id. at 718.
[10] It is interesting to note that under the regulation currently in effect, failure to comply with the regulations would preclude defendants from relying on the non-exhaustion defense raised here.

(l) Failure to establish and follow reasonable claims procedures. In the case of the failure of a plan to establish or follow claims procedures consistent with the requirements of this section, a claimant shall be deemed to have exhausted the administrative remedies available under the plan and shall be entitled to pursue any available remedies under section 502(a) of the Act on the basis that the plan has failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim.
29 C.F.R. § 2560.503-1(l) (2001).
[11] In fact, since Ryan's parents were divorced and both resided in or near Richland, Washington, it would have been difficult to conduct family therapy at Brightway which was located in St. George, Utah.
[12] CMI also sent a letter to the TPA on May 29, 1998, requesting the SPD and the Plan Document.
[13] The statute actually provides for a penalty of up to $100 a day. However, effective July 29, 1997, the maximum penalty was increased to $110 a day to adjust for inflation. See 29 C.F.R. §§ 2575.100, 2575.502c-1 (2001).
[14] The Plan Administrator also argues that only a licensed attorney could act as a representative of a plan participant or beneficiary.